In our second case, United States v. Watkins, Mr. Kish, good to have you with us. Good morning, Your Honor. It's good to be here. And as you've noticed, my name is Paul Kish, so may it please the Court, I'm here on behalf of my client, the appellant Kenneth Watkins. In a case where there's some issues about the sufficiency of the evidence, there's some questions about the admissibility of some evidence, and there's some questions about whether a 10-year sentence calculated based on what is apparently a unique drug under the sentencing guidelines was done correctly. We're coming up close to the 40th anniversary of the first time I stood up in a federal court, in a federal appellate court, to argue a case. And during that time, I've always noticed that when there's questions of the sufficiency of the evidence, it's a spectrum. On the one hand of the spectrum are the cases where, as the government appropriately notices and references in its briefs, all the inferences from the evidence are taken in favor of the verdict. The jury can believe or disbelieve whoever they want, as long as there is some evidence from which a rational juror could make the ultimate inference of guilt beyond a reasonable doubt. On the other hand, on the other end of that spectrum, are cases like this Court's cases I mentioned in our brief, like in Hickman and in Strayhorn and in Barnett and in the Second Circuit's Pauling case, where the courts routinely reverse verdicts when the ultimate inference of guilt is merely a speculation or a guess or a conjecture. I stayed up all night trying to figure out what is the difference between a reasonable inference and a conjecture and a speculation. I continue to believe after 40 years there must be a line somewhere in there that we can focus on. And this case is very close to that line, because in this case the facts, like in all cases involving the sufficiency of the evidence, are so very, very important. You've got a drug dealer, this guy named Cloud in Charlotte. There's three trips couriers make on Cloud's behalf. Trip one, the woman, last name is Sanders, gets a package from a man, a tall, light-skinned black man driving a red sports car, remember that, who hands her a garbage bag or a plastic bag. And inside her drives back to Charlotte. Curiosity gets the better of her. She looks inside. She sees pills. What is the date of this? The summer of 2020 is trip number one. Do we have a date? No. Witness did not illicit a specific date. Just sometime during the summer of 2020. Second trip. And can you tell me where in the record that is? I found your brief seemed to conflate a number of these trips and refer to witnesses where the witnesses didn't testify to that. And so can you help me understand, because when I compare the JA sites in your brief to what happened, it doesn't seem to match up. And so can you tell me where I can find the testimony about the trip in the summer? It's in the direct testimony of Ms. Sanders, Judge Junkwilla Sanders, is where the government elicits from her that during the summer of 2020, I'm sorry, I don't have the citation number in front of me, I don't have it in my record, but I know it's in her direct testimony. This is the red sports car in the summer of 2020? Yes, sir. Three trips? Three trips. Second trip, Ms. Sanders again is asked, and this is where the drug dealer Cloud says, same thing as last time, except there are some differences. On trip number two, she does not meet the tall man in the red sports car, she does not get a garbage bag or a plastic bag, and she does not travel alone. She goes with this guy Reggie that Cloud sends with her. Plus Reggie and she go with some money that she is instructed to give to my client. She gets from my client a closed box. She does not ever look inside the box. At some point, because they have a wiretap on Cloud's phone, they hear phone calls between the drug dealer Cloud, this lady Sanders, and my client, where my client at one point says, I don't have it in there. Now, this is not one of those cases where we have an expert government witness coming in saying, it means that, or red means white, or I know from listening to a range of their conversations what they're probably referring to. We just have the single English language word, I don't have it with me. We don't know if it's money, the box, or what. We do know there's a closed box that Ms. Sanders gets. She takes it back, and this is the trip between October 16 and 17 of 2020 over the evening of that night. She returns and she gives the box to Cloud. We know her testimony is corroborated because there's a poll camera that shows her going into Cloud's house, and again, there are the phones that's showing that her phone went down to and was in propinquity, I think, which is a fancy word meaning close to my client's phone when she meets him down in Atlanta at this club that night. So that's trip number two. Trip number three, different person. The lady whose last name is Anderson. Ms. Anderson meets with Cloud, who says, I need you to go to Atlanta to pick something up. She goes to Atlanta, she meets with my client. Again, she gets a closed box. She takes the closed box. She's on the phone with Cloud driving back to Atlanta when the agents make arrangements for a uniformed officer to stop her on Interstate 85. There's this distinctive Versace box, which we put a photo of in our briefs, and inside of that, when you take the lid off, there are bags full of pills. They test 11 out of these 8,909 pills, and they come back as this substance eutalon, E-U-T-Y-L-O-N-E, which is a scheduled one, synthetic cathinone, and that results in a 10-year sentence for my client. I'm glad that the government has finally conceded that we are reviewing the sufficiency of the evidence de novo, because to me, what would have helped would have been if one side or the other, or both of us, could have found cases the court can compare to where there are closed packages held by the person whose case is on appeal. And the question is whether or not there was sufficient evidence that that person holding or delivering a closed receptacle was more likely than not guilty beyond a reasonable doubt. And it led me to think of something, and I knew there was something around that. So I understand. So your point is, your argument is in effect that a jury could not have believed that the box from October 16th and 17th contained drugs. Yes, that's one of the things. But that's what you're talking about now. When you say the closed container, you're saying on October 16th and 17th, when your client gives in the same thing as the last time that she testified that she believed was pills, that the jury could not believe that that was pills. For that, yes, as well as for the later trip where she was caught. Because in both instances, there's no evidence that my client had any knowledge of what was inside the closed box. When Sanders testified before the jury, were they aware that she pled guilty to conspiracy to distribute a controlled substance related to that exchange on October 16th and 17th? Yes, they were aware of that. The government elicited that from her, that she pled guilty because she had picked up drugs for the drug dealer. So then they knew what it was during that October 16th, 17th transaction. No, I don't quite agree with that. She told the jury, I agreed to conspiring to get drugs. That's all she said. She didn't say it had anything to do with a reference to anything that was picked up on a wiretap. She says, I pled guilty because I went and got drugs for Cloud, which is what she did. I just want to make sure I understand the scope of your argument on this issue. You can stay on this issue as long as you like. If we found that a reasonable jury could have concluded that the box on October 16th and 17th contained pills, then the sufficiency argument goes away. I agree. That's the hinge on it, right? That's one of the hinges. I got to thinking, what is it about this case that seems so familiar to me? A couple of blocks from my office in downtown Atlanta, we're having a big RICO trial involving allegations involving the last presidential election, and there's evidence about closed boxes of ballots and large groups of people working together to essentially alter ballots. I was thinking, what would the case look like if somebody was delivering boxes of ballots not knowing what's inside necessarily, or even if they opened those ballot boxes up, seeing ballots, but not knowing that there was a scheme that led to those ballots being mismarked? What we have here are closed boxes being delivered by someone about whom there's no other evidence, but that even if there's an inference from which he had removed the top of the box and had seen what's in there, this is not a case where there's bales of marijuana, packages of white powder. These are pills. If you went to my office and you pulled out the top drawer, you'll see lots of plastic bags with pills. And the question is, under the reasonable inference... You might or might not want to admit that. They're all vitamins, Your Honor. I like to try to stay as healthy as I can so I can come to court as often as I like. And you buy your vitamins in plastic baggies? No, I buy them in bulk, but I like the fact that they stay sealed longer in the plastic bags. We're getting far afield here, obviously. You brought it up, not me. We think that this is one of those rare cases where the ultimate inference of guilt was just too attenuated for there to be sufficient evidence to support the verdict. And that's why when we get to the admission of what we're calling the rap lyrics, that question becomes so close because the way I've always thought about harmful error issues is that in a case in which the government has loads and loads of evidence, I think that cases even say this, you know, you have to have a highly harmful and prejudicial evidentiary ruling to really result in a reversal. But the closer the case gets, the more magnified are any errors. And here's what happened in our case. The defendant called... I was not trial counsel. The defendant called his wife to testify about this third trip. On cross-examination, out of the blue, the prosecutor says, oh, isn't it true your client and this guy Cloud published a music video in which he said, done time for murder one. You can't say it's out of the blue, right, because she said it's not in his character to do drugs. It's not out of the blue. It's in response. Murder one, I believe, is out of the blue in response to anything that was elicited from her on direct examination. Once you've put his character at issue, he's a good Muslim, he's a family man, and it's out of his character to do drugs. You've now put his character at issue. This is why we cited the Johnson and Alvarado cases, which talk about on the question of when a door is opened by what a lawyer or a party might do, resulting in otherwise inadmissible evidence being kind of fair game. The opening of the door cannot be based upon, I think the language in Johnson and Alvarado says, an unsubstantiated premise. A wife's testimony about the character of her husband is unsubstantiated? No. What is unsubstantiated is the idea that a person who says things like this in a rap video is somehow of bad character. That's what is not substantiated by a person saying that their spouse has a good character. There is nothing about these lyrics that in and of itself is anything other than an expression. And we believe that this was... So if you had a telephone call where he's talking about it, where he's just expressing, I sell truckloads worth of drugs, we'd say it's unsubstantiated because it's just an expression. That would be far more admissible because that's one person talking to another. More admissible, but you don't agree that would be admissible either, right? Your theory depends on that not being admissible either. I don't think so because what I'm talking about is these are publicly disseminated performances. This is not a one-on-one conversation between the accused person and some other person saying I do murder or I do drugs. If he said it in a speech on a stage, then it's not admissible, but if it's on a phone call, it depends on how many people he's talking to? It does depend on context. I totally agree with that. I do, though, want to talk about the evidence regarding this very unique drug, Eutelone. What we have here is there's two different ways to calculate it, and it comes down to Application Note 8 versus Application Note 9 in the Sentencing Guidelines. Application Note 8 talks about the drug conversion table. Application 9 talks about weight per pill or dosage. Two different ways to do the guidelines resulting in two highly dissimilar potential guideline ranges. The method you advocated for by the government used by the district court resulted in an offense level 30 and a 10-year sentence for my client. The method we proposed would have had a guideline range of about a year and a half in prison. The guidelines don't tell the district judge which of these two you should use, probably because this drug never comes up. Neither party was able to find any guidance for this court of how is the proper method for calculating the guidelines here. It comes up in the Northern District of West Virginia with some frequency. Well, I've never seen a reported decision is what I'm getting at, Your Honor. But what I'm getting at is there is some guidance, and we tried to provide it, in that there's this DEA publication we put into the court. It's a Schedule I controlled substance. It is a Schedule I controlled substance. And then the DEA published this item that we mentioned, which talks about how it is it, the eutalone, is what is called a synthetic cathinone, and it has pharmacological and structural similarities to MDMA, something called methylone and pentylone. If you then look at what the Sentencing Commission did in the average weight for each pill of MDMA, remember, which the DEA says is pharmacologically and structurally similar to this drug, you come out to 250 milligrams per pill, amazingly close to what the chemist found when he took these 11 pills out of that Versace box. They weighed 268 milligrams per pill. If you do the calculation that way, you result in an offense level 10. But the lower court followed the government's suggestions that, oh, no, no, you go to this drug conversion table, and that results in an offense level 30. We submit the lower court simply erred, because then there's two competing ways to calculate the potential drug. You don't dispute that it is a synthetic cathinone, right? I do not. No, sir. And you agree that the conversion table makes a synthetic cathinone at the 1 to 380? I do. I see that my time is up here. May I answer that? You answer questions as long as you answer. You do agree that that's what it says? I do agree that's what it says, correct. And so instead what you want to say is that we should look at the structural similarities to MDMA rather than what the guidelines tell us to look to? No, I don't say that we're not doing what the guidelines say. I'm saying the synthetic cathinone is 1 to 380, and this is a synthetic cathinone. I'm not sure I understand. I want to understand your argument. I'm not trying to – I understand. It also says that when you've got MDMA, you calculate it as weighing 250 milligrams per pill. Is this MDMA? No. DEA says it is. It says it has structural similarities. It does not say that it's MDMA. It says that it's a synthetic cathinone. You're correct. Thank you. Thank you very much, sir. You saved some time. Ms. Ray? May it please the Court. Amy Ray for the United States. I will open, Judge Richardson, by answering your questions. I believe your question about the record, I think the description that Ms. Sanders makes of and what she describes as July or August of 2020 is on pages 121 to 123 of the Joint Appendix. The district court in this case properly denied Mr. Watkins' motion for judgment of acquittal. The court reasonably admitted the rap-lyric evidence, very limited rap-lyric evidence, and the district court properly calculated the advisory guideline in this case. Just beginning, I guess, with the sufficiency of the evidence argument, I note that the only thing the government really has to show is that either one of these transactions took place, that some transaction took place between these folks. And so while I believe that the jury could reasonably infer from all of this evidence that Mr. Cloud sent Ms. Sanders on one case and then Ms. Anderson on the second trip that all of that happened and that Watkins was involved in all of it, probably the strongest evidence is with respect to the October 24th trip that Ms. Anderson took. And what we know from that trip was a few days before. First of all, we do have the evidence that Ms. Sanders went down on October 16th to the 17th. She brings back something in a box. Of course, last time she brought a whole bunch of pills. I think she estimated 10,000. And then she brings that back on the 17th. On the 20th, Ms. Anderson asks Mr. Watkins, you've got any pills? He says, no, I'm down to 2,000. Somebody stole 4,000 last night. They took 4,000 pills. I've got to get some. You ready to make a trip? So she goes down three days later, or rather four days later after that. So the 17th is when Sanders comes back with what we think are pills. On the 20th, he talks to her. Maybe this doesn't matter, and maybe we have to take it in the light most favorable to you. But is there reason to think that the 4,000 and 2,000 is pills and not money? I'm not sure that matters. But you characterized that as being a discussion about pills. When I read it, it didn't naturally seem it was pills. I thought they were talking about money, but I actually don't know the answer to that. I thought there was evidence that it was pills, Judge Richardson. But if there wasn't, I apologize for that. But I did think it was pills. Maybe that's just the inference. I think the inference can go either way. Fair enough. And I think it can, too. In any event, even if you took all of that out, we have him telling us. I'm not sure it matters for your theory. When I read it, I didn't naturally read it as being about pills but about money. But reading a transcript is hard sometimes. Fair enough. And so let's assume, just for the sake of argument, that it was about money because I don't want to rely on saying it was pills in any representation. You get the inference. You can infer it either way. Right. You get which one you want. I'm not walking away from the possible inference. I'm also saying that what we also have in addition to that is that on the 24th, he has a conversation with Anderson, actually, before the 24th. We know she leaves early in the morning on the 24th, leaves Charlotte. We've got all kinds of communications. We've got cell phone geolocation evidence. She goes down to Atlanta. She talks to Cloud and says, I'm going to bring your money back when I get back to town. That's like 10, 40 years or so before she meets with where we have the cell phones meeting with Mr. Watkins. Then she meets with him. And on her way back, she stopped with, I think it was 9,809, almost 10,000 pills of Eutelon. So she denies that that came from Watkins, but the jury could certainly infer that it came from Watkins given all of the information we need. This is the box from the gentleman. No, this is the box from Watkins because they met in the geolocation. This is from the 24th. I'm not talking about the child. But Anderson testified it didn't say who. Oh, yes. It was from a gentleman. Yes. She pleaded guilty, but she wouldn't tell us who she actually got the box from. She pleaded guilty and didn't come clean. That's what you're calling it. That's right. She pleaded guilty, but she wouldn't say who did it. And in this trial, she disclaimed that it was Mr. Watkins. And then we have very interesting cross-examination, or rather defense testimony about two witnesses who saw her at a Chevron before it's any event. The district court could, of course, reject her testimony that it didn't come from him and could infer that the pills did come from Watkins. So I don't think that the sufficiency of the evidence claim here requires any unusual speculation or anything like that. It requires an inference. And this court recognized, for example, in United States v. Dennis, that the whole point in sufficiency of the evidence in conspiracy cases is, can the jury reasonably infer based on circumstantial evidence? And the United States presented plenty of that in this case. Turning to the rap lyric argument, I think, really, as I was preparing for oral argument, the best case for us in this is this court's 2018 case in United States v. Resio, R-E-C-I-O. It was referenced in Mr. Watkins' brief, actually. And there, this court recognized that rap lyrics are admissible when they go to or they're relevant to a fact question in the case. So normally, it would be, for example, where a defendant has transported cocaine and he is rapping about transporting cocaine. This is a different situation because it came out during the Kizzie Child's direct examination. And also I note during Ms. O'Neill's direct examination that he was a really good guy and then Ms. Child's testifies that he's not done any drugs. He's only really interested in his religion, his family, and his work ethic. And that's what she says. And so now he's opened up the character evidence. And these very limited rap lyrics are relevant to whether and directly responsive to whether or not he has any interest in the drug trade. And he is glorifying that drug trade in these. And in Recio, this court recognized that it's really even an adoptive admission for someone to rap about or to, sorry, to adopt. You can adopt rap lyrics simply if the jury can infer that the person who is speaking about it intends to acquiesce in the statement. And in Recio, it is somebody who isn't the rapper but just puts the quote up in his Facebook page. And in this case, it's somebody who's actually rapping multiple times about I'm a doper for real and the truckloads and bails. Is your view that it would have been admissible as a statement of a party opponent? I understand this is not what it was introduced as. Right. But as either a statement of a party opponent or a statement against penal interest? I do. Or on the merits? I mean, it was introduced here as character evidence, rebuttal only. But in theory, at least if it was a marijuana case, it could have been introduced as a statement against interest or a statement of a party opponent. I do believe that. Well, it was a party opponent is the one that I would say. I mean, it could be either way. But Recio specifically talks about the adoptive of admission. And I would say in this case, it's kind of an alternative theory of admission. I think it was admissible as that as well. I want to address very briefly, just in case this court had any concerns about the admissibility of the evidence, the question of harmlessness. And again, refer to the court's decision in Recio because one of the points that Judge Motz I think made in Recio was that the admission of the evidence would have been harmless anyway. And she notes that in that case, the jury's questions that they asked made it clear that they were really focused on the evidence of guilt, not anything related tangentially to the rap lyrics. In other words, they were asking very specific questions. And we had exactly the same thing in this case. The jury several times asked questions of the district court. They wanted to know basically whether Stephen Cloud had been convicted of crime. They wanted to know the status of him. They wanted to know what Anderson's real relationship with the defendant was. They wanted to know the identities and the phone numbers of one of the calls. So that tells us that the jury was focusing on the evidence that the United States presented in its case in chief, not these rap lyrics. So even if it were admitted and it was not admissible, it would be harmless. I guess turning briefly to the sentence, at the end of the day, the sentencing guidelines describe sentence synthetic cathinone and it says it's 1 gram to 380 grams of converted drug weight. The chemist testified on page 244 of the joint appendix that Eulone is a synthetic cathinone. And I also want to note that the drug quantity that was needed to get to offense level 30 was 1,000 kilograms of converted drug weight. And the one seizure from Ms. Anderson alone would have gotten us to 908,580 grams. So in other words, 908 kilograms, almost 1,000. We only needed about 268 more grams of these pills to get us to offense level 30, above and beyond the seized quantity. So if what we assume to be drugs or pills in the box not seized wasn't counted, it would have been a lower base offense level? Barely, yes. In other words, yes. Well, yes, Your Honor. Because it would have gone down to a 28, right? That's right. So that would have been a guideline range of 87 to 108 versus the 108 to 135 that the court used at the time the sentence was imposed. Yes. We did need at least some, we needed more drugs than were seized. So her sentence, the court's sentence was outside the recommended guideline range if it had been dropped down to a base offense level of 28. Yes. But as I said, that assumes that the court could not find, even by a preponderance of the evidence, that Ms. Sanders brought back pills when she came from Watkins on October 17th. Well, isn't it a little more than that? Was it reasonable for the court to find in determining the drug weight, was it reasonable for that court to find that the weight was the same? Because it basically, you lose if you don't count the box that was not seized, about 2,000 grams, right? That's about half of what we choose to calculate the base offense level. But, Your Honor, the base offense level only required 1,000 kilograms. We only needed 268 grams to get there. But how did the court reasonably conclude what the weight of the drugs, assuming it was pills because he said the same thing? Because he went three times. The first time, Ms. Sanders testified. I looked in. She estimated thousands of pills. It's a bag. She picks up the box a second time and says it felt the same. She assumed it was the same stuff. So the district court could reasonably infer that he sent her down multiple times. The second time was similar to the first time. But we don't need to get anywhere near 10,000 pills to support offense level 30. All we needed was for that shipment that we're inferring that at least 268 grams somewhere was in a shipment that he would have trafficked with Mr. Cloud. And I don't think that the district court, I think the district court could reasonably infer that it was more likely than not. And that's the standard, not beyond a reasonable doubt. More likely than not that when she brought back a box that weighed about the  that there probably was at least 268. Yes, he went with the probation officer's recommendation of 2,000 grams, but we didn't need nearly that much. So I think that the district court made a fair judgment. And also I would note that the sentencing guidelines don't require precision. The sentencing guidelines only require a reasonable estimate. And the district court's findings satisfied that standard. Your Honors, if you don't have further questions about any of these issues, the United States respectfully requests that this court affirm the judgment of the district court. Thank you so much. Thank you, Ms. Ray. Mr. Cash? Yes, sir. Just briefly, the guilty plea by Ms. Anderson to which government counsel referred to during her testimony included her reference to, I got the box from those, and I pled guilty because I conspired with those, and her quote was, known and unknown. She simply didn't say the name of the person to whom she was supposed to, from whom she got the box. She just said, some of these people, I don't know who they are. Second, on the admission of the lyrics, we cited the Reccio case mostly to show the lack of a fit between the lyrics in that case and its evidence. There was a fit in our case, and we actually believe that supports our position. Third, on the sentencing, I believe Judge Groh is right in that if we don't have any way of estimating what's in this closed box that she, the courier, gets from my client,  that's the bottom line on that issue. But that also encompasses the other issue that we brought up and we raised, which is whether it was appropriate to calculate the seized quantity by using a sampling method. Now, there are legions of cases that talk about sampling is an appropriate method. You know, you've got a bale of marijuana, you take a little piece of it, and you test it, and therefore you're allowed to extrapolate that into the whole bale, or all of the bales have marijuana. Fine. The government hasn't cited, and I've never found a case in which you take a pill, and then you take a grain of one pill out of the 11 that you're testing, and then you extrapolate that one grain finding to 8,909 pills, along with 2,000 supposedly in a seized box. But they took one pill from each bag. One pill from each bag. I agree. But all I'm saying is there are limits, there must be limits to the process of extrapolating an entire quantity's Schedule I substance from this testing method. I agree that in the context of the more common drugs, you know, the marijuana, the cocaine, you know, the heroin, fine. Extrapolate. And the government's right. There simply needs to be a reasonable estimate. But there must be a limit to that reasonable estimate. What's the limit? I don't know, but I think this is over the limit, especially in a case where there simply is no evidence that the other pills. Do you have a case? I do not. No, but it's not my burden of proof either. It's the government's burden, and I believe that they didn't sustain it. We think that the sentence was inappropriate. Thank you very much. Thank you, Mr. Case. Thank you, Ms. Ray. We're going to come down in Greek Council, and then we're going to take a short break. This Honorable Court will take a brief recess.
judges: Robert B. King, Julius N. Richardson, Gina M. Groh